## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

|  |  |
|---|---|
| **JEFFREY HUGHES, SR.**, an individual,<br><br>Plaintiff,<br><br>v.<br><br>**CENTURUM, INC.**, a Florida corporation,<br><br>Defendant. | **CIVIL ACTION**<br><br>Case No.   **2:21-cv-820**<br><br>**Judge:**<br><br>**Mag. Judge:** |

## COMPLAINT AND DEMAND FOR JURY TRIAL

**NOW COMES** the Plaintiff, **JEFFREY HUGHES, SR.** ("HUGHES, SR." or "Plaintiff"), by and through undersigned counsel, and states the following for his Complaint:

## INTRODUCTION

1.     This is an action brought under the federal Rehabilitation Act (Rehab Act), False Claims Act (FCA), and Florida's Private Whistleblower Act (FWA) for (1) disability discrimination in violation of the Rehab Act, (2) retaliation in violation of the FCA, and (3) retaliation in violation of the FWA.

## JURISDICTION AND VENUE

2.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331.

1

3.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

4.     Venue is proper in the United States District Court for the Middle District of Florida because the Plaintiff worked in, and the Defendant conducts business in, and some or all of the events giving rise to Plaintiff's claims occurred in Collier County, Florida, which is within the Middle District of Florida. Venue is proper in the Fort Myers Division under Local Rule 1.04x since Collier County is within the Fort Myers Division.

## PARTIES

5.     Plaintiff, **JEFFREY HUGHES, SR.** ("**HUGHES, SR.**" or "Plaintiff") is an individual who is domiciled in Collier County, Florida and was employed by the Defendant as its Chief Financial Officer.

6.     Defendant is a Florida corporation and employed the Plaintiff in Collier County, Florida. The Defendant is a private company that describes itself as a company that "delivers end-to-end life cycle solutions for Defense, Homeland Security, and other Federal Agencies," and the majority of its employees require a Department of Defense security clearance. The Defendant receives the majority of its millions of dollars of annual income from the contracts it has with federal agencies. The Defendant employs in excess of 250 employees and is an employer under the Rehab Act, FCA and FWA.

## GENERAL ALLEGATIONS

2

7.      The Plaintiff began his employment with the Defendant on February 10, 1986 and worked for the Defendant for 36-years. The Plaintiff was most recently employed by the Defendant as its CFO, and also held other significant job titles during his career with the Defendant such as: Sr. VP, Board of Director, Officer (both Treasurer and Secretary), Corporate VP of Human Resources; Corporate Compliance Officer, Corporate Security Officer, 401K Plan Administrator, Medical Plan Administrator, and Head of IT. The Plaintiff also has a high-level Security Clearance.

**Disability Discrimination**

8.      Section 504 of the Rehab Act prohibits recipients of federal financial assistance from discriminating against qualified individuals with disabilities in employment.

9.      In May 2015, the Plaintiff was diagnosed with an essential tremor, and in January 2018, he learned he would require a thalamus ablation surgery.

10.     The Defendant's CEO then requested that the Plaintiff send him information about the procedure.

11.     The procedure was completed on April 12, 2018, but it did not correct the essential tremor. Instead, the Plaintiff was diagnosed with Parkinson's Disease in October 2018.

12.     In January 2019, the Defendant's CEO (Robert Matteucci) expressed that he wanted to terminate Louise Sundermier (HR and Treasury Manager), who

had worked for the company for 34-years because he said he "wants her and her husband with Diabetes off the medical plan to reduce claims since she is almost 70-years old and beyond Medicare age." At the time, the Plaintiff felt that it was not a good reason to dismiss her as it was illegal and she was not ultimately fired.

13.     In her role as HR, Ms. Sundermier had access to the Plaintiff's medical documents that come in from the website of the medical companies that Centurum had. Since 2018, the Plaintiff learned that she continually asked Kevin Kelleher (Health and Life Insurance Broker for Centurum, also Plaintiff's personal broker) about Plaintiff's cognitive state. Plaintiff was once again expected by CEO to layoff Ms. Sundermier to reduce costs for 2021, which she was informed of by the Plaintiff on January 8, 2021. Ms. Sundermier was angry, and immediately called the CPA Judy Welde. CPA Judy Welde then immediately called the Defendant's CEO Matteucci, who suddenly called the Plaintiff that afternoon to direct him to reverse Ms. Sundermier's layoff permanently. CEO Matteucci called Ms. Sundermier the next day on Saturday to deny knowledge of her layoff and discuss Plaintiff. Upon information and belief, Ms. Sundermier conveyed the Plaintiff's diagnosis to CPA Judy Welde and Executive Management (in violation of HIPAA), who began questioning the Plaintiff about his mental state, despite the Plaintiff having no impairment that adversely affected his ability to perform all the essential functions of his position. Weeks later, the Defendant placed the Plaintiff on administrative leave, before terminating him on September 3, 2021.

4

**Defendant's Commission of Fraud Against the Government**

14.     In April 2020, the Defendant's CEO requested that the company seek a PPP loan.

15.     On April 15, 2020, the Defendant was approved for a total PPP loan of $4,875,008, albeit through Republic Bank (with whom Plaintiff and his wife had an executive relationship with) as Wells Fargo had refused the Defendant's application.

16.     In October 2020, the Defendant applied for forgiveness of the PPP loan, and received forgiveness in the amount of $3,193,218 on June 23, 2021, due in large part to the Plaintiff's detailed tracking of all allowable PPP expenses and proof thereof.

17.     Because the Defendant is a federal government contractor, its receipt of PPP loan forgiveness had to be accounted for properly under the Defense Contract Audit Agency and Defense Contract Management Agency published guidance and regulations.

18.     More specifically, the amount of a PPP loan that is forgiven must be applied as a credit or cash refund to the government. The credit must be applied to contract costs in the same manner in which the PPP loan funds were originally spent by the contractor. For example, if a portion of the forgiven PPP loan was used to pay facility rent, the cost of facility rent should be credited. If that rent is part of an indirect cost pool, then the indirect cost pool would be reduced by the

credit in the period in which the loan is forgiven. If a PPP loan was expended for direct contract cost and the contract can no longer be credited (i.e., it is complete), then the credit will be returned to the Government. Simply put, the Defendant was required to credit or refund the $3,193,218 of PPP loan forgiveness back to the government.

19.     However, the Defendant's CEO did not want to do this. Instead, he devised a plan to fraudulently misrepresent to the government that the $3,193,218 was not made forgivable and/or was spent on items not covered by the Defendant's government contracts in order to try to illegally retain $3,193,218 that was legally required to be returned to the government by representing it was a non-refundable grant under the Federal Acquisition Regulations. The DCMA mandates it be immediately notified of SBA approved PPP loan forgiveness, but the Defendant's CEO issued a directive that no one notify them of the loan forgiveness.

20.     As the CFO, the Plaintiff was tasked by the CEO to execute the fraud on the government, but flatly refused to do so. The Defendant's CEO told Plaintiff not to inform anyone in the company that the Plaintiff successfully secured PPP loan forgiveness of $3,193,218, including even the Defendant's President/COO/Board of Director Samuel Seymour until he (CEO) could implement his plan to keep the PPP loan forgiveness. In fact, on Friday, August 6, 2021, the Plaintiff informed the CEO that he would not lie on the DCAA report

that was due on Monday, August 9, 2021 and that he would be filing the legally compliant reports because doing otherwise would be illegal and would present legal liability for the company and its officers. Additionally, Defendant's CPA Judy Welde called Plaintiff on Friday, August 6th to confirm Plaintiff was correct that Defendant's CEO Matteucci explicitly instructed her to delete any reference to Defendant's receipt of PPP loan forgiveness from the 2020 certified financial statement notes section she was required to include. This was to ensure the DCAA and DCMA would not find out.

21.     On Sunday, August 8, 2021, the Defendant's CEO telephoned the Plaintiff and advised him that he was immediately placed on administrative leave and that his access to all company documents and IT systems was restricted.

22.     Shortly thereafter, the Defendant terminated the Plaintiff's support staff who had knowledge of the PPP schemes (who also may have known about the CEO's other schemes).

23.     The Defendant's DCAA fraud scheme was not the only illegal behavior that the Plaintiff objected to in the weeks leading up to his administrative leave and termination. Further examples are:

    a.  Defendant's CEO's FAR Violations DCMA Audit

        i.  Agata Matteucci (CEO's wife) paid $100k annually.  She has never worked for the Defendant but has been paid since the 1980's. When the Plaintiff asked what she did for the company, the CEO told him that she was the "travel

7

secretary" for the Defendant. However, she was also claimed on PPP forgiveness fully doubling her charging in 2020.

ii. The Federal Acquisition Register (FAR) requires employees to fill out their time sheets daily, and sign them certifying the costs being charged to the Federal Government contracts regardless whether direct or indirect labor. DCAA/DCMA are very serious about auditing this. Robert Matteucci (CEO) in 2021 did not want to learn a new time-sheet interface, so he has not filled out nor signed his own time sheet, and instructed the Controller to fill out and sign his time-sheet.

iii. Furthermore, the CEO's medical benefits are being carried under "Agata Matteucci" to illegally avoid taxation of S Corporation taxable fringes, with CPA Welde's knowledge of this IRS issue.

iv. Jason Matteucci (CEO's other son) receives $50,000 per year but has never worked and is hidden in CIO which is not audited. In recent years, he was also getting paid just to have medical insurance. When the Plaintiff questioned what role he had in the company, the CEO told me he was a "consultant" and to draft a standard consulting agreement for IT support even though Jason has full-time IT employment in Austin, Texas.

v. Defendant's CEO took $225,000 in back vacation pay, which had been accumulated against Company policy over a decade, and kept the money even after it being ruled unallowable by DCAA.

vi. Defendant's CEO has a Jupiter, Florida warehouse office building – charged to the government – to store his multimillion-dollar 1930's Rolls Royce car collection.

b. <u>Employee Retention Credit 941 IRS Violations</u>

i. The Defendant applied ERC credit in advance in Q1 2021 of $1,800,000 to reduce its indirect costs on CPFF contracts in order to recompute and artificially depress Q1 revenue to look like they made the 20% decline in Q1 2021 vs Q1

2019 per the rules. The Defendant applied ERC credit in advance in Q2 2021 of $1,200,000 to reduce its indirect costs on CPFF contracts in order to recompute and artificially depress Q2 revenue to look like they made the 20% decline in Q2 2021 vs Q2 2019 per the rules.

ii.   The Defendant's Q2 2021 revenue was still too high to meet the 20% decline threshold, so they applied DCAA 2018 audit disallowance of $165,000 to Q2 only not spread over the 2021 year, and $225,000 DCAA home office 2018 audit disallowance of $225,000 to Q2 because the CEO took $225k in back vacation pay ruled unallowable by DCAA. Adding the $1,200,000 to $165,000 plus $225,000 equaled $1,590,000 in Q2 2021 revenue reduction which was enough to recompute revenue artificially downward putting it 20% below Q2 2019.

iii.   The Defendant saved the remaining $600,000 from ERC Q2 2021 to apply in 2022.

24.   The Plaintiff complained of and refused to participate in the above-referenced illegal acts numerous times. In addition, the Plaintiff consistently objected to such illegal practices and tried to put a stop to the illegal conduct identified above, including in the weeks immediately preceding being placed on administrative leave (before being terminated on September 3, 2021).

25.   Instead of investigating the Plaintiff's complaints and objections, just days after his last complaints, the Defendant abruptly placed him on paid administrative leave and then terminated him on September 3, 2021.

26.   As a direct and proximate result of objecting to and filing a complaint regarding the Defendant's violations of law, which included the Defendant

fraudulently obtaining, using and retaining government monies, the Defendant subjected the Plaintiff to adverse employment action, to wit: his termination.

## COUNT I – VIOLATION OF VIOLATION OF 31 U.S.C. § 3730(h): RETALIATION

27.     Plaintiff incorporates by reference Paragraphs 1-7 and 14-26 of this Complaint as though fully set forth below.

28.     The Plaintiff, an employee, believed in good faith, and a reasonable employee in the same or similar circumstances would also believe, that Defendant was committing a fraud upon federal government agencies and other private entities.

29.     Defendant – through the CEO – was aware of Plaintiff's objections to the Defendant's illegal conduct.

30.     Immediately thereafter, Plaintiff began to receive a hostile work environment, and adverse employment action.

31.     Immediately after objecting to Defendant's misdeeds, Plaintiff began to be subjected to retaliation.

32.     Pursuant to 31 U.S.C. § 3730(h) of the False Claims Act (hereinafter "FCA"), any employee who is discharged, demoted, suspended, threatened, harassed and otherwise discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done under the FCA is entitled to all relief necessary to make the employee whole.

33.     The purpose of the FCA, as explained in the Senate report accompanying the 1986 amendments to the FCA, states that Congress added a retaliation provision to the FCA "to halt companies… from using the threat of economic retaliation to silence 'whistleblowers'" and to "assure those who may be considering exposing fraud that they are legally protected from retaliatory acts." S. Rep. No. 99-345, at 34 (1986), U.S. Code Cong. & Admin News 1986, at 5266, 5299.

34.     Defendant began its negative employment actions against Plaintiff and ultimately did discharge him from his position for reasons contrary to public policy, as set out in 31 U.S.C. § 3730(h) and without just cause.

35.     Defendant, in discharging, suspending, demoting, threatening, disciplining and harassing Plaintiff in and from his employment, retaliated and discriminated against him because of complaints and concerns raised by him to Defendant.

36.     The acts of Defendant in demoting, suspending, threatening, disciplining, harassing, discriminating, and retaliating against Plaintiff, including but not limited to the wrongful discharge of employment, adverse employment actions, denial of true and correct performance appraisals, demotion and termination of Plaintiff by Defendant violated the provisions of 31 U.S.C. § 3730(h).

37.     Following Plaintiff's objection to Defendant's misappropriation and illegal retention of federal funds, Defendant has discriminated, suspended,

demoted, threatened, disciplined, harassed and retaliated against Plaintiff for lawful conduct protected under the FCA.

38.    Defendant has terminated, discharged, suspended, threatened, disciplined, harassed, and discriminated against Plaintiff in his employment in violation of 31 U.S.C. § 3730(h).

39.    Defendant has discriminated and retaliated against Plaintiff for lawful and protected conduct in connection with his objection to and attempts to stop fraud, investigation of the fraud, potential testimony concerning, and assistance in an action filed or to be filed under the FCA, 31 U.S.C. § 3729 et seq.

40.    Plaintiff is entitled to all relief necessary to make him whole, including reinstatement with the same seniority status that he would have had but for the discrimination and two times the amount of back pay.

41.    Plaintiff, pursuant to 31 U.S.C. § 3730(h), is entitled to litigation costs and all reasonable attorneys' fees incurred in connection with this action.

42.    Plaintiff's conduct, including but not limited to investigating Defendant's misappropriation and retention of federal funds, and also raising complaints concerning same and bearing witness to violations of same, potential testimony concerning, potential initiation of and assistance in an action filed or potentially to be filed pertaining to the FCA, is all protected conduct under the FCA.

43.    Defendant knew that Plaintiff was engaged in protected conduct as referenced herein.

44.    Defendant discharged, terminated, demoted, suspended, threatened, disciplined and harassed Plaintiff from his employment and after his employment, and otherwise discriminated against him because of his protected conduct.

45.    As a direct and proximate result of the violations of 31 U.S.C. § 3730(h) as referenced and cited herein, Plaintiff has lost all the benefits and privileges of his employment and has been substantially and significantly injured in his career path that was anticipated from his employment.

46.    As a direct and proximate result of the violations of 31 U.S.C. § 3730(h) as referenced and cited herein, and as a direct and proximate result of the prohibited acts perpetrated against him, Plaintiff is entitled to all relief necessary to make him whole.

**WHEREFORE**, Plaintiff requests trial by jury of all issues so triable as of right, and:

i.    Injunctive relief directing this Defendant to cease and desist from all retaliation against employees who engage in speech protected by the FCA;

ii.    Back pay and all other benefits, perquisites and other compensation for employment which Plaintiff would have received had he

maintained his position with the Defendant, plus interest, including but not limited to lost salary and bonuses;

iii.   Double back pay;

iv.   Front pay, including raises, benefits, insurance costs, benefits costs, and retirement benefits;

v.   Reimbursement of all expenses and financial losses Plaintiff has incurred as a result of the Defendant's actions;

vi.   Declaratory relief declaring the acts and practices of the Defendant to be in violation of the statutes cited above;

vii.   Reasonable attorney's fees plus costs;

viii.   Compensatory damages, and;

ix.   Such other relief as this Court shall deem appropriate.

## COUNT II –VIOLATION OF FLORIDA STATUTE 448.102: FLORIDA'S PRIVATE WHISTLEBLOWER ACT

47.   Plaintiff incorporates by reference Paragraphs 1-7 and 14-26 of this Complaint as though fully set forth below.

48.   Plaintiff was an employee of the Defendant, a private company.

49.   At all material times, Plaintiff was to be protected from negative employment action by Florida Statute 448.102(1)-(3), commonly known as Florida's "whistleblower statute," which in relevant part provides:

"An employer may not take any retaliatory personnel action against an employee because the employee has:

14

(1) Disclosed, or threatened to disclose, to any appropriate governmental agency, under oath, in writing, an activity, policy, or practice of the employer that is in violation of a law, rule, or regulation. However, this subsection does not apply unless the employee has, in writing, brought the activity, policy, or practice to the attention of a supervisor or the employer and has afforded the employer a reasonable opportunity to correct the activity, policy, or practice;

(2) Provided information to, or testified before, any appropriate governmental agency, person, or entity conducting an investigation, hearing, or inquiry into an alleged violation of a law, rule, or regulation by the employer, and;

(3) Objected to, or refused to participate in, any activity, policy, or practice of the employer which is in violation of a law, rule, or regulation."

50.     Plaintiff did engage in statutorily protected activity by his objections and refusal to participate in the Defendant's illegal practices.

51.     Immediately after engaging in statutorily protected activity, Plaintiff suffered negative employment action, his termination, which is a direct result of this statutorily protected activity.

52.     Plaintiff's termination and his engaging in statutorily protected activity are causally related.

53.     The Defendant knew that Plaintiff was engaged in protected conduct as referenced herein.

54.     The Defendant discharged, terminated and retaliated against Plaintiff from his employment and after his employment, and otherwise retaliated against him because of his protected conduct.

55.     As a direct and proximate result of the violations of F.S. § 448.102, as referenced and cited herein, Plaintiff has lost all of the benefits and privileges of his employment and has been substantially and significantly injured in his career path that was anticipated from his employment.

56.     As a direct and proximate result of the violations of F.S. § 448.102, as referenced and cited herein, and as a direct and proximate result of the prohibited acts perpetrated against him, Plaintiff is entitled to all relief necessary to make him whole.

**WHEREFORE,** Plaintiff demands damages against Defendant for violation of Florida's Private Sector Whistle-blower's Act (Section 448.102, Fla. Stat.), including but not limited to all relief available under Section 448.103, Fla. Stat., such as:

(a) an injunction restraining continued violation of this act,

(b) reinstatement of the employee to the same position held before the retaliatory personnel action, or to an equivalent position,

(c) reinstatement of full fringe benefits and seniority rights,

(d) compensation for lost wages, benefits, and other remuneration,

(e) any other compensatory damages allowable at law,

16

(f) attorney's fees, court costs and expenses, and

(g) such other relief this Court deems just and proper.

## COUNT III – VIOLATION OF THE REHAB ACT, AS AMENDED

57.     Plaintiff incorporates by reference Paragraphs 1-13 of this Complaint as though fully set forth below.

58.     At all relevant times, the Plaintiff was an individual with a disability within the meaning of the Rehab Act.

59.     Specifically, the Plaintiff has physical impairments that substantially limit one or more of his major life activities and bodily functions, has a record of the impairment, and is regarded by the Defendant as having such impairments.

60.     The Plaintiff is a qualified individual with disabilities as that term is defined in the Rehab Act.

61.     The Plaintiff is an individual who, with reasonable accommodation, at all relevant times could perform the essential functions of his job with the Defendant.

62.     At all material times, the Plaintiff was an employee and the Defendant was his employer covered by and within the meaning of the Rehab Act.

63.     The Defendant was made aware and was aware of the Plaintiff's disabilities, which qualify under the Rehab Act.

64.    The Defendant discriminated against the Plaintiff with respect to his terms, conditions, and privileges of employment because of his disabilities by terminating his employment.

65.    The Defendant conducted itself with malice or with reckless indifference to the Plaintiff's federally protected rights.

66.    The Defendant has discriminated against the Plaintiff in violation of the Rehab Act by interfering with his enjoyment of all benefits, privileges, terms, and conditions of his employment.

67.    The conduct of the Defendant altered the terms and conditions of the Plaintiff's employment and the Plaintiff suffered negative employment action.

68.    As a direct and proximate result of the violations of the Rehab Act, as referenced and cited herein, the Plaintiff has lost all of the benefits and privileges of his employment and has been substantially and significantly injured in his career path that was anticipated from his employment.

69.    As a direct and proximate result of the violations of the Rehab Act as referenced and cited herein, and as a direct and proximate result of the prohibited acts perpetrated against him, the Plaintiff is entitled to all relief necessary to make him whole.

70.    As a direct and proximate result of the Defendant's actions, the Plaintiff has suffered damages, including but not limited to, a loss of employment opportunities, loss of past and future employment income and fringe benefits,

humiliation, and non-economic damages for physical injuries, mental and emotional distress.

**WHEREFORE**, Plaintiff requests trial by jury of all issues so triable as of right, and:

i.     Injunctive relief directing the Defendant to cease and desist from all disability discrimination of all employees;

ii.    Back pay and all other benefits, perquisites and other compensation for employment which plaintiff would have received had he maintained his position with Defendant, plus interest, including but not limited to lost salary and bonuses;

iii.   Front pay, including benefits, insurance costs, benefits costs, and retirement benefits;

iv.    Reimbursement of all expenses and financial losses Plaintiff has incurred as a result of Defendant's actions;

v.     Declaratory relief declaring the acts and practices of Defendant to be in violation of the statute cited above;

vi.    Reasonable attorney's fees plus costs;

vii.   Compensatory damages, and;

viii.  Such other relief as this Court shall deem appropriate.

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Fed. R. Civ. P. 38(b) and the Seventh Amendment to the United

States, the Plaintiff demands a trial by jury as to all issues triable as of right.

Respectfully submitted,

Dated: November 4, 2021          <u>**/s/ Benjamin H. Yormak**_____</u>
                                 Benjamin H. Yormak
                                 Florida Bar Number 71272
                                 Trial Counsel for Plaintiff
                                 YORMAK EMPLOYMENT & DISABILITY LAW
                                 9990 Coconut Road
                                 Bonita Springs, Florida 34135
                                 Telephone: (239) 985-9691
                                 Fax: (239) 288-2534
                                 Email: byormak@yormaklaw.com