UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

JEFFREY HUGHES, Sr.,

Plaintiff,

v. Case No. 2:21-cv-820-JLB-KCD

CENTURUM, INC.,

Defendant.
_______________________________________/

**ORDER**

Defendant Centurum, Inc. ("Centurum") moves to dismiss Plaintiff Jeffrey Hughes, Sr.'s amended complaint. (Doc. 22.) Upon careful review, the motion is **GRANTED in part**, and Mr. Hughes's amended complaint is **DISMISSED with leave to amend**.

**BACKGROUND**

Centurum is a private company that "delivers end-to-end life cycle solutions for Defense, Homeland Security, and other Federal Agencies." (Doc. 20 ¶ 6.)[1] Mr. Hughes worked for Centurum for thirty-sixty years until his termination in

[1] "At the motion to dismiss stage, all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff." Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1273 n.1 (11th Cir. 1999) (citation omitted). A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Under this standard, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at 678.

September 2021. (Id. ¶¶ 5, 7, 25.) At the time of his termination, Mr. Hughes was Centurum's Chief Financial Officer ("CFO"). (Id. ¶¶ 5, 7.)

In 2015, Mr. Hughes was diagnosed with an essential tremor, and in 2018, he learned that he would require surgery. (Id. ¶ 9.) Centurum's Chief Executive Officer ("CEO") requested that Mr. Hughes send him information about the procedure. (Id. ¶ 10.) The procedure did not correct the essential tremor, and Mr. Hughes was diagnosed with Parkinson's Disease in October 2018. (Id. ¶ 11.)

Centurum's Human Resources and Treasury Manager, Louise Sundermier, had access to Mr. Hughes's medical documents, and "continually asked" Centurum and Mr. Hughes's insurance broker about Mr. Hughes's cognitive state. (Id. ¶ 13.) Sometime around January 8, 2021, Ms. Sundermier conveyed Mr. Hughes's medical diagnosis to Centurum's certified public accountant ("CPA") and Executive Management, including its CEO, "who began questioning [Mr. Hughes] about his mental state, despite [Mr. Hughes] having neurological impairments that affect life functions such as movement and lifting, but which did not rise to the level of an impairment that adversely affected his ability to perform all the essential functions of his position." (Id.) Centurum terminated Mr. Hughes from his position as CFO on September 3, 2021. (Id. ¶ 25.)

Also prior to Mr. Hughes's termination, in April 2020 Centurum was approved for a Paycheck Protection Program ("PPP") loan in the amount of $4,875,008. (Id. ¶¶ 14–15.) In October 2020, Centurum applied for forgiveness of the loan and, in June 2021, Centurum received forgiveness in the amount of

$3,193,218. (Id. ¶ 16.) According to Mr. Hughes, "[b]ecause [Centurum] is a federal government contractor, its receipt of PPP loan forgiveness had to be accounted for properly under the Defense Contract Audit Agency [("DCAA")] and Defense Contract Management Agency [("DCMA")] published guidance and regulations." (Id. ¶ 17.) He further alleges that Centurum's CEO "devised a plan to fraudulently misrepresent to the government that the $3,193,218 was not made forgivable and/or was spent on items not covered by [Centurum's] government contracts in order to try to illegally retain $3,193,218 that was legally required to be returned to the government by representing it was a non-refundable grant under the Federal Acquisition Regulations," and "issued a directive that no one notify [the DCMA] of the loan forgiveness." (Id. ¶¶ 19–20.)

As Centurum's CFO, Mr. Hughes was "tasked by the CEO to execute the fraud on the government, but flatly refused to do so." (Id. ¶ 20.) Mr. Hughes told the CEO that he would not lie on a DCAA report due on August 9, 2021, and that he would file a report that complied with applicable laws. (Id.) Centurum's CPA called Mr. Hughes on August 6, 2021 to confirm that the CEO instructed her to delete any reference to the loan forgiveness from the 2020 certified financial statement notes. (Id.) On August 8, 2021, Mr. Hughes was placed on administrative leave with restricted access to company documents and IT systems. (Id. ¶ 21.) As noted, he was terminated less than a month later, on September 3, 2021. (Id. ¶ 25.) "[I]n the weeks leading up to his administrative leave and termination," Mr. Hughes also

complained "to his superiors" of various other instances of "misconduct." (Id. ¶¶ 23–24.)

Following Mr. Hughes's termination, he and Centurum discussed settlement of any claims either party might have in exchange for, among other things, two months' pay as severance. (Id. ¶¶ 27–29.) The settlement discussions occurred over email and phone, and no written settlement agreement was ever signed by Mr. Hughes. (Id. ¶¶ 27–31; Doc. 22-2–Doc. 22-8.)

Mr. Hughes filed this lawsuit on November 4, 2021, raising three claims against Centurum: retaliation in violation of the False Claims Act ("FCA"), 31 U.S.C. § 3730(h) (Count I); retaliation in violation of Florida's Private Whistleblower Act ("FWA"), Fla. Stat. § 448.102 (Count II); and discrimination in violation of the Rehabilitation Act (Count III). (Docs. 1, 20.) On November 9, 2021, Centurum sued Mr. Hughes in Florida state court, asserting claims of conversion and breach of the duties of loyalty and care, and seeking declaratory judgment to enforce a purported settlement agreement between the parties. Centurum, Inc. v. Hughes, Sr., No. 50-2021-CA-012461 (Fla. 15th Cir. Ct. Nov. 9, 2021); (Doc. 20 ¶ 32; Doc. 22-1.)

Centurum now moves to dismiss Mr. Hughes's amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (Doc. 22.) Centurum first contends that the parties reached a settlement agreement in which Mr. Hughes waived the claims he raises in this action. (Id. at 14–17.) Centurum next argues that, even if Mr. Hughes has not waived his claims, his allegations do not state a claim under the

FCA, FWA, or Rehabilitation Act. (Id. at 18–26.) Mr. Hughes responded in opposition (Doc. 41), Centurum filed a reply (Doc. 49), and Mr. Hughes filed a sur-reply (Doc. 55).

## DISCUSSION

The purported settlement agreement between the parties is not, at this stage of the litigation, a basis to dismiss the action. However, Mr. Hughes's claims are due to be dismissed with leave to amend in light of the pleading deficiencies noted below.

### I. The purported settlement agreement is not, at this stage of the litigation, a basis to dismiss the action.

Centurum contends that, through their email correspondence and telephone conversations—despite the absence of a signed settlement agreement—the parties reached a settlement agreement whereby Mr. Hughes waived his claims. (Doc. 22 at 14–17.) Accepting the factual allegations as true and construing all reasonable inferences in Mr. Hughes's favor, the Court finds that such a determination is unsupported, at least at this stage in the litigation.

District courts have the "inherent power to summarily enforce settlement agreements entered into by parties litigant in a pending case." Ford v. Citizens & S. Nat'l Bank, 928 F.2d 1118, 1121 (11th Cir. 1991) (quotation omitted). Dismissal under Federal Rule of Civil Procedure 12(b)(6) is appropriate if the claims asserted are subject to a waiver or release of claims. See, e.g., United States ex rel. Higgins v. HealthSouth Corp., No. 8:14-cv-2769-T-33AEP, 2019 WL 4060176, at *2–6 (M.D. Fla. Aug. 28, 2019) (dismissing FCA retaliation claim where plaintiff released

claims in severance agreement); United States ex rel. Keeler v. Eisai, Inc., No. 09-22302-CIV-UNGARO, 2011 WL 13099033, at *3–4 (S.D. Fla. June 21, 2011) (same).

Although relevant, the fact that Mr. Hughes did not sign a written settlement agreement is not dispositive. See Reed ex rel. Reed v. United States, 717 F. Supp. 1511, 1517 (S.D. Fla. 1988). Indeed, in Florida, parties can reach an enforceable agreement to waive and release claims through email exchanges where the terms of the agreement are sufficiently specific and the parties mutually agree on all material terms. See, e.g., Miles v. Nw. Mut. Life Ins. Co., 677 F. Supp. 2d 1312, 1315 (M.D. Fla. 2009) (finding an enforceable agreement where parties "said the same thing" in emails regarding the essential terms); see also Spiegel v. H. Allen Holmes, Inc., 834 So. 2d 295, 297 (Fla. 4th DCA 2002).[2]

Here, Centurum contends that the parties "reached a binding agreement on September 7, 2021, when Hughes'[s] counsel explained on two separate occasions that he and his client 'accept[ed] [Centurum's] terms.'" (Doc. 22 at 15.)[3] Some context, however, is necessary.

---

[2] Additionally, a settlement agreement is only enforceable where the opposing party's attorney had clear and unequivocal authority to enter into the agreement. See Murchison v. Grand Cypress Hotel Corp., 13 F.3d 1483, 1485 (11th Cir. 1994). Mr. Hughes does not dispute that this requirement is met. (Doc. 41 at 9.)

[3] In support of its position, Centurum submits email communications between the parties. Mr. Hughes does not contend that the Court is unable to consider the materials or that consideration of the materials would require converting the motion to dismiss into a motion for summary judgment. See Roberts v. Carnival Corp., 824 F. App'x 825, 826 (11th Cir. 2020) (a court may consider extrinsic materials referred to in the complaint, central to plaintiff's claims, and of undisputed authenticity); see also N. Brevard Hosp. Dist. v. McKesson Techs., Inc., No. 6:16-cv-637-Orl-40DCI, 2017 WL 951672, at *3 (M.D. Fla. Mar. 10, 2017); (Doc.

On September 7, 2021, Centurum sent proposed terms to Mr. Hughes's attorney. (Doc. 22-2.) His attorney responded in an email, "We accept these terms. Please prepare a settlement release for our review." (Doc. 22-3.) On September 10, 2021, Mr. Hughes's attorney wrote to Centurum as follows: "I am surprised we have not heard back from you. Your clients seemed very rushed to get a deal together. Is the paperwork still being drafted? Any chance they are considering attempting to breach our agreement?" (Doc. 22-5.) The parties then exchanged a proposed agreement incorporating the discussed terms as well as additional terms, and on September 20, 2021, Mr. Hughes's counsel returned a revised version of the proposed agreement. (Doc. 22-6.) On September 28, 2021, Centurum provided Mr. Hughes's counsel with another draft of the proposed settlement agreement. (Doc. 22-7.) And following a conversation on October 1, 2021, Centurum wrote to Mr. Hughes's counsel, "I am confirming our discussion this morning that your client will not be seeking to revise the terms of the settlement agreement." (Doc. 22-8.)

Viewing the allegations and reasonable inferences taken therefrom in a light most favorable to Mr. Hughes, although the parties appeared to agree in principle that, in exchange for two months of severance pay, Mr. Hughes would waive any claims that he has, there were other unresolved matters. See Midtown Realty, Inc. v. Hussain, 712 So. 2d 1249, 1251 (Fla. 3d DCA 1998) ("[W]here it appears that the parties are continuing to negotiate as to essential terms of an agreement, there can

---

20 ¶¶ 27–31.) As noted, even if considered at this stage, the extrinsic materials do not support a finding that Mr. Hughes's claims were waived.

be no meeting of the minds." (quotation omitted)). Further, in a light most favorable to Mr. Hughes, the allegations and reasonable inferences suggest that the parties intended that there would be no binding contract until the negotiations were reduced to a formal writing. See Club Eden Roc, Inc. v. Tripmasters, Inc., 471 So. 2d 1322, 1324 (Fla. 3d DCA 1985) ("Where the parties intend that there will be no binding contract until the negotiations are reduced to a formal writing, there is no contract until that time." (citation omitted)).

For example, the proposed terms for paragraphs 2 and 5 in Centurum's September 7, 2021 email expressly contemplated a signed settlement agreement. (Doc. 22-2 at 2.) Likewise, paragraph 14 required the parties to sign "mutual general releases," but neither party signed one. (Id.) Further, subsequent proposed agreements included new terms. (Compare Doc. 22-2, with Docs. 22-6, 22-7.)[4] And drawing reasonable inferences in favor of Mr. Hughes, through at least September 28, 2021, the parties' counsel continued to negotiate. Indeed, on that date, Centurum provided a proposed written agreement, titled "For Settlement Purposes Only // Confidential // Draft," and stated, "As discussed, here is current version incorporating what we discussed . . . ." (Doc. 22-7.) Centurum's counsel followed

[4] These additional terms include a more detailed return of property provision, terms relating to remedies and adjudication in the event of a breach of the agreement, and a list of "employee representations," such as a representation that Mr. Hughes "has not been retaliated against for reporting any allegations of wrongdoing by [Centurum] or its agents" and that he "is not aware of any wrongdoing, regulatory violations, or corporate fraud committed by [Centurum], its officers, or its employees." (Doc. 22-7 at 4.) Centurum asserts that these latter terms are merely "factual statements" but does not explain how they are not essential. (Doc. 49 at 5 n.6.)

up: "I will need a response today, and I really don't have any flexibility on my side with the terms. If your client approves, we just need the items he has located to finalize the property list," and "I need confirmation today that the best and final terms I sent are accepted." (Doc. 41-7 at 1; Doc. 41-9 at 1.)

In short, viewing the allegations and reasonable inferences drawn therefrom in a light most favorable to Mr. Hughes, the ongoing discussions between the parties reflect that there was no agreement as to every essential term. See, e.g., Tomlinson v. Landers, No. 3:07-cv-1180-J-TEM, 2009 U.S. Dist. LEXIS 144660, *6–12 (M.D. Fla. Apr. 27, 2009) (finding that revision to a proposed agreement indicated ongoing negotiations); Nichols v. Hartford Ins. Co. of the Midwest, 834 So. 2d 217, 219–20 (Fla. 1st DCA 2002) (finding indemnification clause an essential term). Similarly, Mr. Hughes's counsel's September 7, 2021 email would reflect at best an agreement to agree in the future, which Florida courts have routinely found unenforceable. See, e.g., Taxinet, Corp. v. Leon, No. 16-24266-CIV, 2020 U.S. Dist. LEXIS 93826, at *26 (S.D. Fla. May 28, 2020), adopted 2020 U.S. Dist. LEXIS 220105 (S.D. Fla. Nov. 24, 2020).

In summary, at least at this early stage in the litigation and accepting all allegations set forth in the operative complaint as true and viewing them, of course, in a light most favorable to Mr. Hughes, the purported settlement agreement does not present a basis to dismiss Mr. Hughes's claims. Centurum may again raise this

issue in a motion for summary judgment, with the benefit of summary judgment evidence.[5]

## II. Retaliation Under the FCA

In Count I of his amended complaint, Mr. Hughes raises a claim for retaliation under the FCA, essentially alleging that Centurum applied for and received a PPP loan in April 2020, that Mr. Hughes was instructed not to report forgiveness of a portion of the loan to the DCAA and DCMA, and that he was terminated because of his refusal to cooperate. (Doc. 20 ¶¶ 14–52.)

To state a claim for retaliation under the FCA, Mr. Hughes must show that: (1) he engaged in conduct protected under the FCA by acting in furtherance of an FCA enforcement action or other efforts to stop FCA violations; (2) Centurum knew that he was engaged in protected conduct; and (3) Centurum retaliated against him because of the protected conduct. See Mack v. Augusta-Richmond Cnty., 148 F. App'x 894, 896–897 (11th Cir. 2005); United States v. KForce Gov't Solutions, Inc., No. 8:13-cv-1517-T-36TBM, 2014 WL 5823460, at *10 (M.D. Fla. Nov. 10, 2014). He must show, specifically, that the retaliation resulted from him engaging in activity

[5] The parties dispute the significance of Centurum's failure to pay the severance payments contemplated by the purported settlement agreement. Mr. Hughes suggests that this failure discharges him of his contractual obligations, while Centurum contends that the payment was contingent on Mr. Hughes returning all its property and, in all events, does not disprove the existence of an agreement. (Doc. 41 at 3, 17; Doc. 49 at 10.) Similarly, the parties also dispute the significance of Centurum's subsequent action against Mr. Hughes. At least at this stage in the litigation, it is unnecessary to conclusively resolve these contentions.

protected by the FCA and related to an FCA violation. See United States ex rel. Chase v. HPC Healthcare, Inc., 723 F. App'x 783, 791–92 (11th Cir. 2018).

The FCA prohibits retaliation against employees who file an FCA claim or engage in conduct that creates "at least a distinct possibility of litigation under the [FCA] at the time of the employee's actions." Singbush v. Fla. Neurological Ctr., LLC, No. 5:19-cv-603-Oc-40PRL, 2020 WL 10486655, at *6 (M.D. Fla. Aug. 19, 2020) (quotation omitted). Merely reporting a belief that a practice or activity is unlawful without "alleging that the wrongdoing constitutes fraud on the federal government" is insufficient. Id. Moreover, "conclusory statements about the possible wrongdoings without allegations of particular facts regarding what false statements were actually made by [a defendant] to the Government, when those false statements were prepared or made, who prepared or made the false statements, or the contents of the alleged false statements, do not rise to the level of an FCA violation." Id. at *7. Notably, "[c]ourts have held that employees whose complaints fall within the scope of their job duties must provide their employers with clear notice of their intent to pursue an FCA action" to establish that their employer had notice of the protected activity. KForce, 2014 WL 5823460, at *10 (citations omitted).

As currently pleaded, Mr. Hughes's allegations do not establish an FCA retaliation claim. Mr. Hughes merely alleges that, consistent with the scope of his duties as CFO, he told Centurum's CEO that he "would not lie on the DCAA report" and explained that doing so would be "illegal and would present legal liability for

the company and its officers." (Doc. at 7, ¶ 20.) Mr. Hughes does not expressly allege that he was asked to lie on a report or that he notified anyone at Centurum of specific conduct that would constitute a violation of the FCA. Indeed, there are no allegations as to, specifically, what false statements under the FCA Centurum made or planned to make to the government. This is insufficient. See, e.g., KForce, 2014 WL 5823460, at *11 (dismissing FCA retaliation claim where "there are no, and can be no, factual allegations to support a finding that [plaintiff] engaged in protected conduct" where he was "just doing his job").

Additionally, Mr. Hughes fails to persuasively refute Centurum's contentions that his conduct would not have put Centurum on notice of potential litigation because there was nothing unlawful about Centurum directing its employees not to report forgiveness of the loan in 2020 or 2021. (Doc. 22 at 20–21.) Indeed, as Mr. Hughes acknowledges, Centurum received loan forgiveness in 2021, not in 2020. (Doc. 20 at 5, ¶ 16.)[6]

Mr. Hughes next asserts that Centurum's state court action was pursued in retaliation for protected conduct under the FCA. As noted, however, to the extent he contends the protected conduct was him telling Centurum's CEO that he would not lie on the DCAA report, the claim is insufficient. And to the extent Mr. Hughes contends that the protected conduct was the filing of this action, Mr. Hughes does

[6] Neither party adequately supports its position on this issue with pinpoint citations to legal authority, and it is ultimately unnecessary to resolve this issue in ruling on Centurum's motion. Mr. Hughes should nonetheless consider this issue if he decides to file an amended pleading.

not allege that Centurum had knowledge of this action when it filed its complaint in Florida state court, and there are no facts alleged from which the Court could draw such a reasonable inference. Indeed, the affidavit of service in this case indicates that Centurum was served on November 10, 2021, after the state court action was filed. (Doc. 9; Doc. 20 ¶ 32; Doc. 22-1.)

Mr. Hughes's other allegations of various misconduct that he purportedly reported "to his superiors" are also insufficient. (Doc. 20 ¶¶ 23–24.) Indeed, Mr. Hughes does not specify to whom he objected, when, or, as to much of the conduct, why the conduct was unlawful. See, e.g., United States v. Prometheus Lab'ys, Inc., No. 8:18-cv-2931-T-33AAS, 2020 WL 6203527, at *8 (M.D. Fla. Oct. 22, 2020) (dismissing FCA retaliation claim where plaintiff did "not specify which scheme – of the many he alleges in the second amended complaint – he brought to his employer's attention, or if he alerted them to any possible false claims [that were filed] or anything that would offer sufficient notice thereof," and noting that "[r]eports of regulatory failures without a connection to fraudulent claims knowingly submitted to the government do not constitute protected conduct under the FCA" (citations omitted)).

In short, without adequate factual allegations to support Mr. Hughes's FCA retaliation claim, the claim fails. See HPC Healthcare, Inc., 723 F. App'x at 792 (deeming allegation that employee suffered retaliation because she "raised ethical issues concerning violations of the [FCA]" a legal conclusion). Accordingly, Count I

is due to be dismissed, and Mr. Hughes shall have an opportunity to amend his pleading consistent with this Order.

**III. Retaliation under the FWA**

Mr. Hughes relies on the same allegations to support the FWA claim asserted in Count II. (Doc. 20 ¶¶ 53–60.) The claim is also due to be dismissed with leave to amend for similar reasons.

The FWA prohibits an employer from retaliating against an employee who reports or refuses to assist unlawful activity. Golf Channel v. Jenkins, 752 So. 2d 561, 562 (Fla. 2000). To state a claim, Mr. Hughes must allege that: (1) he engaged in protected activity; (2) he suffered an adverse employment action; and (3) that the action was causally linked to the protected activity. See White v. Purdue Pharma, Inc., 369 F. Supp. 2d. 1335, 1336 (M.D. Fla. 2005). Courts have found that, to satisfy the first element, a plaintiff must allege that he objected to conduct that actually violated a law, rule, or regulation. See, e.g., Pierre v. AIDS Healthcare Found., Inc., No. 19-62556-CIV, 2020 WL 6381557, at *4–6 (S.D. Fla. Oct. 30, 2020)[7]

As noted, Mr. Hughes has not established that the conduct he objected to violated a law, rule, or regulation. Indeed, although he alleges a variety of purportedly wrongful conduct, he provides no law, rule, or regulation that such

[7] The Eleventh Circuit has left open the question of whether this element could also be satisfied by a "good faith, objectively reasonable belief that [the] activity is protected by the statute." See Butterfield v. JetBlue Airways Corp., No. 20-13473, 2022 WL 291003, at *5 (11th Cir. Feb. 1, 2022). Neither party addresses this issue. It is, in all events, unnecessary to conclusively determine the applicable standard to resolve Centurum's motion.

conduct violated. More detail as to the nature of the purported wrongdoing and causation between any protected activity and Mr. Hughes's termination is required. Accordingly, Count II is due to be dismissed, and Mr. Hughes shall have an opportunity to amend his pleading consistent with this Order.

## IV. Disability Discrimination in Violation of the Rehabilitation Act

In Count III, Mr. Hughes asserts a claim of disability discrimination under the Rehabilitation Act. (Doc. 20 ¶¶ 63–76.) "To establish a prima facie case of discrimination under the Rehabilitation Act, an individual must show that (1) he has a disability; (2) he is otherwise qualified for the position; and (3) he was subjected to unlawful discrimination as the result of his disability." Tarmas v. Sec'y of Navy, 433 F. App'x 754, 761–62 (11th Cir. 2011) (quoting Sutton v. Lader, 185 F.3d 1203, 1207–08 (11th Cir. 1999)).[8] To establish causation, the individual must show that he suffered an adverse employment action "solely by reason of" his disability. Id. (quoting 29 U.S.C. § 794(a)) (emphasis added).

Here, Mr. Hughes alleges that in 2015 he was diagnosed with a tremor and that in 2018 Centurum's CEO asked him about his surgery. (Doc. 20 ¶¶ 9–10.) He further alleges that the CEO asked him to terminate Centurum's HR Manager because of her age and her husband's diabetes, that the HR Manager discussed Mr. Hughes's cognitive state with Centurum's health insurance broker in 2018, and, "[u]pon information and belief," that the HR Manager conveyed details of Mr.

---

[8] Courts apply decisions analyzing Americans with Disabilities Act claims to Rehabilitation Act claims. See Holbrook v. City of Alpharetta, 112 F.3d 1522, 1526 n.2 (11th Cir. 1997).

Hughes's Parkinson's diagnosis to Centurum's CPA and Executive Management. (Id. ¶¶ 12–13.)

Centurum observes that Mr. Hughes does not allege any other facts supporting his conclusion that Centurum's CEO—the individual who made the decision to terminate him—had knowledge of his Parkinson's diagnosis. Nor does he allege that the HR Manager or CPA participated in Centurum's decision to place Mr. Hughes on administrative leave or terminate him. As alleged, years passed from the CEO asking Mr. Hughes about his surgery and the eventual decision to terminate Mr. Hughes. Centurum thus concludes that Mr. Hughes has failed to allege the required causal connection between his putative disability and any adverse action. See, e.g., Parker v. Dezzi, No. 8:21-cv-1459-TPB-SPF, 2021 WL 5395958, at *1–3 (M.D. Fla. Nov. 18, 2021) (dismissing claim with leave to amend for failure to "allege[] any events to show a causal connection between [plaintiff's] disability and demotion," where he was diagnosed with cancer in 2016 and demoted in 2019).

In all events, as Mr. Hughes acknowledges, there is no allegation that Centurum terminated Mr. Hughes solely because of his disability. (Doc. 41 at 26 n.6; Doc. 20 ¶¶ 63–76.)[9] Accordingly, Count III is due to be dismissed, and Mr. Hughes shall have an opportunity to amend his pleading consistent with this Order.

---

[9] Centurum argues that Mr. Hughes's Rehabilitation Act claim is contradicted by his allegations that he was terminated because of his purported whistleblower activity. (Doc. 22 at 25.) As Mr. Hughes observes, however, at this stage in litigation he may plead alternative theories of liability. See Forsyth v. Univ. of Ala. Bd. of Trustees, No. 7:17-cv-854-RDP, 2018 WL 3012343, at *4 n.3

## CONCLUSION

For the above reasons, it is **ORDERED**:

1. Defendant's motion to dismiss (Doc. 22) is **GRANTED in part**.

2. Plaintiff's amended complaint (Doc. 20) is **DISMISSED without prejudice** and **with leave to amend**.

3. Plaintiff may file a second amended complaint consistent with this Order on or before **August 1, 2022**. Failure to timely file an amended complaint will result in dismissal of this action without further notice.

ORDERED at Fort Myers, Florida, on July 18, 2022.

JOHN L. BADALAMENTI
UNITED STATES DISTRICT JUDGE

(N.D. Ala. June 15, 2018). Thus, while other factors motivating his termination may ultimately preclude relief, such allegations are not a basis for dismissal.